We're going to take a break after this case, before the Littlefield case. For those of you here for the Littlefield case, you will want to know that. Good morning and thank you. May I reserve three minutes, Your Honor? Yes, you may. May it please the Court, I am Joan Lukey. With me on brief and at table is the trial counsel in this matter, Peter Palmer of Fuller Rosenberg Palmer & Bellevaux. Kayleigh Higgins, the defendant appellant in this matter, also the cross appellee, comes before this Court asking only for this. That the Court review de novo two of the conclusions of law entered by the District Court. We do not dispute any findings of fact, nor I suspect would you think that we would, since the Court found in favor of Ms. Higgins on all factual matters. The two issues that we ask you to address de novo are whether the Court erred in refusing to apply the standard of the 1989 amendment to Chapter 93A, Sections 9 and 11, to be applied only in cases of willful, intentional, or bad faith unfair insurance practices. In this case, the District Court found willful, intentional, and bad faith conduct, and even noted... And as part of that, part of the reasons that the trial court gave for not doing so was that... And it's a little unclear what the trial court meant, whether he meant it was collusive or merely not at arm's length. Are we agreed that that's what the first issue is? That's a more articulately stated version of what I was saying, which is should he have applied the 1989 amendment or not? One can't exactly tell from his decision. All of the issues appear in two paragraphs on page 16, the final page. Everything else there is no problem with. As to Section 9, the direct claims of Ms. Higgins, there actually is no explanation given as to why he chooses to use the pre-1989 amendment. Remember, the actual damages standard before that amendment, which is a penal statute, it's meant to be penal, were the actual damages caused by the delay in the bad faith practices of the insurer. The SJC, as it notes in Granger, invited the legislature to amend that since those damages were deemed inadequate. The legislature did so. Counsel, how was this $7.5 million consent judgment, how was the judge in the proceeding that issued before us, how was the judge supposed to treat that? Well, I mean, it has no judicial imprimatur of any kind. It was entered as a matter of agreement between the claimant and the insured and entered as a consent judgment on that basis. So it's had no judicial scrutiny at all. Well, Your Honor, if I may re-second that. So how was the judge supposed to treat it? Well, what he's supposed to do under 93A is do the reasonableness hearing in the context of the 93A proceeding. That's what Gore v. Arbella Insurance tells him to do, and that's what's been done in the Commonwealth since that case was decided in 2010. So to the extent that there were any concerns about the absence of an arm's-length transaction, whether there was something collusive about it, that should all factor into the reasonableness analysis. Is that your position? That's exactly right. And, in fact, that's what Gore v. Arbella basically says. The key is, was the dollar amount of the consent judgment reasonable as defined with regard to verdicts in similar cases, and this is a traumatic brain injury case, so there's not really any issue there, and as to whether there's any suggestion of collusion. But the collusion is actually subsumed as part of the reasonableness issue. Here, I would just differ slightly on saying there's no judicial reprimand. I'm sorry. Are you suggesting a collusive settlement can be reasonable? That's not the way I read Gore. No, I'm not suggesting it can be reasonable, Your Honor. I'm suggesting that when looking at reasonableness. So if the reviewing 93A court, 176D court, finds that there was collusion in the consent judgment, why doesn't the inquiry end there? If a court were to find collusion meeting the standard under Massachusetts law of what collusion means, and this state has a very high bar for collusion, then you would be absolutely correct, Your Honor, we don't have any finding of collusion here, none whatsoever. What we have is in the section 11 paragraph when the court says that it chooses not to take into account the assigned claims from the insured that it did not believe that the assignment agreement was at arm's length. Now, we know from the Supreme Court of the United States, and that's the same definition that's applied in Massachusetts, that arm's length means that the parties have to be acting as if they were two strangers. But as the court noted in Gore, and this has been noted at other times as well, in the circumstance where an insurer has acted in bad faith in terms of not investigating and settling a case, it will often be true that the insured and the injured party's interests align. They are not strangers. They have the common goal of shifting the reasonable amount of damages to the recalcitrant bad faith insurer. The bar owner here, once his liability was limited to $50,000, what incentive did he have to hold down the figure that the settlement figure, the total figure, since he was going to assign those claims? Your Honor, his liability isn't limited. If you look at the assignment agreement, which is an exhibit in the case, and the cover email, Exhibit 74, where the parties talk about the need to reach a reasonable number, in the agreement, the bar remains liable. Now, that's an important distinction. The bar is still liable, but Ms. Higgins has agreed she won't attempt to collect from the bar. There could be circumstances under which, for whatever reason, an assignment of rights occurred that caused someone else to go after the bar. The bar did not get a release of its liability, only an agreement that Ms. Higgins wouldn't seek on her own behalf to collect from them. So wouldn't the statute of limitations have run on somebody else trying to bring a suit, and there was no other such suit out there? Well, Your Honor, it would depend on the circumstances. Well, yes, but on the facts of this case. So you're suggesting that that provision was meaningless. I respectfully disagree. No, that it was quite meaningful, but it reduced the bar and the bar owner's incentive to hold down the sum of the total settlement. But, Your Honor, if you look at the sum of the total settlement, remembering that what we're addressing here is reasonableness, there is no one, including the district court, who would suggest that in terms of the value of the underlying tort claim against the bar, the value of $7.5 million was other than reasonable. As Judge Hillman explains at length on page 4 of his decision, this is a permanent traumatic brain injury. She can't even leave her home. She cannot work. She is permanently disfigured. She has permanent disabilities. This is in line with other cases, and there was expert testimony on that. So you put on an expert. They didn't put on an expert. Well, that is true. As to reasonableness of damage. Well, it's certainly true because one of the things Gore suggests that the court look to is whether there are other verdicts in that same range, and the claims adjuster expert, Mr. Kariokas, testified to that. The court itself could have looked at the cases which were cited to it by Ms. Higgins. Counsel, are you suggesting then that we, if we, would you agree with you that the court should have looked at that $7.5 million consent judgment? Are you suggesting that we should remand with instructions that the court engage in the analysis that it did not engage in? Well, Your Honor, if you were inclined to rule against Ms. Higgins, I'm suggesting you would have to remand because there's no finding of collusion. There's no explanation except the arm's length standard. However, what I'm also suggesting is that the findings of fact have been made. You don't need to remand. You don't have to remand on Section 9. Section 11 is somewhat more complicated, but on Section 9, he's already made the findings that it was willful, intentional, and in bad faith, and he hasn't told us why he didn't apply the actual damages standard, which is the amount of the judgment below, consent judgments being included under Gore v. Arbella. He hasn't told us why he didn't do that, but you have the findings, and you know what the statute says. The amendment was intended to punish bad faith insurers. We have the findings, but I'd like you to comment on a point that was, I forget which brief it was in. It was almost mentioned in passing, and that was that the insurance company was informed of the settlement negotiations between the other two parties. Number one, my first question is, is that your understanding? And number two, was the company not only informed, but given an opportunity to participate in the negotiations? Yes, Your Honor. The letter is in, and forgive me, I don't have the exhibit number for you, but I'm sure you can find it. The insured sent a letter to capital inviting them to participate, saying it is our intention and we wish to be allowed because we're facing excess exposure. The insurance coverage had been ruled by the court to be limited to $300,000 alcohol policy. So we're asking you to give us this permission and telling you this is what we're planning to do, and they chose not to participate. Pardon me. I didn't read the letter as involving an invitation to participate. It was just, will you waive an insurance provision to allow us to conduct these negotiations? I believe you are technically correct, Your Honor, except for the practice in the industry. You don't ask someone just for the fun of it. They would like a waiver. You almost never get a waiver. You generally get a statement that the insurer will participate. In other words, to pull this process secretive is simply not true. They were told that this was going to be a waiver. That wasn't the question. I'm sorry. Justice Souter has further questions. Are you telling us that although literally there was no invitation in the letter, there are circumstances from which we should infer or any fact finder should infer that they were actually, given industry practice, open to participation but apparently voluntarily chose not to take any part? Yes, Your Honor. Is that what you're telling us? Yes, I am suggesting. Doesn't that then, if you are correct, have a tremendous bearing on how any kind of reasonableness analysis, collusion analysis, et cetera, would in fact play out? Well, of course it does, Your Honor, and that's why we were so emphatic in our own briefing, which is on the response side to their claims, that to call this secretive is simply unfair. When an insurer is notified that these discussions, the insurer is requesting permission to go ahead with the discussions, if the insurer doesn't say more than just no, then the insurer has chosen not to interject. Is there evidence in the record that the industry practice is what you say? I don't believe there is, Your Honor. I wasn't there, but I don't believe there is. Nonetheless, we respectfully suggest it wasn't a secret. The insurer knew that these discussions were going on, and this court found that the conduct of the insurer was the paradigm of bad faith conduct in how they proceeded. And as to Judge Lopez's question, I would simply say again that the issue of whether one can proceed in the fashion that happened here, we think is very clear. They had the right to go forward with settlement, and then it was up to the 93A judge, in this case the district court, to decide whether it was reasonable. But they had already tendered the $300,000 policy limit at this point. That doesn't matter. It may not. I'm just trying to work this through. If on their understanding they have met their obligation by tendering the full amount of the insurance, what is their incentive to be involved in this? Is it to avoid a 176D claim? Your Honor, yes. A significant part it is because So insurers are always going to have to do this after they've tendered the policy limits in order to avoid a 176D claim? Not if they, like the vast majority of insurers, have acted in good faith. They knew what was in their file. It's all cited by Judge Hillman in his decision. It's all in the record. They attempted to get her to walk away by tendering the policy at a point in time that was later than what the judge found to constitute the bad faith conduct. So the bad faith has already occurred. They know they acted in bad faith. They know what he found from their own records and the words of their own adjuster, Mr. Wedgwick, they weren't in the dark as to the fact that they had conducted themselves in bad faith. It's very clear, and Judge Hillman so found. A follow-up question, if I could. Yes. On the respect to the assigned claim, the Section 11 claim, again, it sort of goes to what you might be asking us to do. I mean, it's the district court did not deal with that claim and summarily explained why. You, of course, say he should have. It seems to me you are asking us to now decide that claim in your favor on the basis of all the fact-finding that was done rather than remanding with instructions perhaps to say you should have addressed that claim. Are you asking us to decide that claim here on the basis of that? I'm telling you, you have enough to decide that claim. As we have said in the brief, you could also remand. But respectfully, Your Honor, the judge only had the right to, well, let me back up. The judge has to make the findings or you would have to do so under Section 11. He simply said I choose not to do so because of what is a damages issue. He still has to make the findings even if instead of using the 1989 amendment because he thinks that an arms-length transaction is the proper test, although it's not, he has to make the findings and use the actual damages definition from before. That's only a damages issue so that that one paragraph is a non sequitur. He can't say I choose not to take it into account because of the fact that I think it's not arms-length. That would deal with which standard of damage he uses, not whether there was a 93A Section 11 violation. Ms. Luque, I have a question on the bad faith willfulness. Yes. The trial judge says it violated criminal liquor liability statutes to serve a minor. They knew she was 20 years old, but they allowed her to drink to excess and that led to the accident. Nobody's really focused very much on that in the briefing of the case. Is it clear that there is no contributory negligence permissible if there has been a violation by the bar of this criminal statute? That's number one. Number two is even if contributory negligence were not available as a defense, wouldn't it nonetheless go to the issue of damages? Your Honor, the rule is because she's 20 and not younger than 20, there is available to some servers of alcohol the defense of mistake, that is that they didn't understand or perceive. No, that's not answering my question. My question is the relationship between the criminal law liability, which seems pretty clear, and the availability of a comparative negligence defense. It wasn't available because comparative negligence is only available as a defense of mistake. So if they could say they didn't know she was 21 and she looked to be 21 or she had faith in me. Do you have a case that says that? We'll take a 28-J letter from each of you on this point. On that issue. My second question was even if the defense were not available to the bar, couldn't they nonetheless argue that because she was the one who willingly drank and knew she was intoxicated when she got into that car, that that should affect the sum of damages? I think not, Your Honor. What Judge Hillman found was that they required her to drink as part of her job and that they can't then turn it on her and say so it's your fault or it's your fault in part. Yeah, but nobody's given us any law on any of these points. Well, respectfully, Your Honor, Judge Hillman says very clearly that in his view, no jury could have returned any meaningful finding of contributory negligence under circumstances where an underage minor known to the employer to be an underage minor is required as part of her job to get patrons to buy her drinks, can then turn on her and say so you're partially at fault yourself. She needs a job to survive. That's clear from the record. In addition, the second, you're dealing with only the direct service issue. The other basis for liability that was found is that PJD had a policy and assumed duty to have their employee walk the exotic dancers to their cars, determine if they were impaired, and call a cab if they were. There's no comparative negligence on that. Okay, thank you. Excuse me, counsel, did you reserve some time? I reserved three minutes, Your Honor. Okay, I just, I guess as a heads up for you, you'll probably want to do this anyhow, but I do have some concerns about the liability determination based on a failure to effect a prompt, fair, and equitable settlement. And I say that because my understanding is that from the time the lawsuit was filed in the state court, there was a settlement within a matter of months, seven months, 11 months, perhaps something like that. As soon as that suit was filed, a lawyer was retained to do an investigation. Investigation was done. He told the company that they shouldn't think of settlement until a deposition was done to Ms. Higgins. I'm having some questions about how in that time frame on those kind of facts, there would be a basis for finding that there was a failure to effectuate a prompt settlement. I suspect opposing counsel is going to get into that, but at least for me it's important that you address that in your rebuttal. I will address that. I will also point out Judge Hillman made an ostrich head in the sand finding, that is that they would have been available if they hadn't intentionally shut off the investigation that they initially started and prevented. Okay, we'll get to that. All right, thank you. Thank you. Good morning. My name is Kevin O'Connor, Your Honors, and I represent Capital Specialty. Thanks for the opportunity to be heard on this case. I think the panel should be very clear as to what you're actually being asked to do here. This is an underlying case, or it arises out of an underlying case, in which Ms. Higgins agreed to settle her claims against the two people at fault or she alleged were at fault for her accident, PJD and the driver of the other car, Officer Duffy, for a total of $80,000. It's a case in which Capital offered to pay her the full limit of liability of its policy, which was at that time $285,000, within months of the lawsuit being initiated, and Capital ultimately paid the full remaining limits of liability of its policy, $267,000, after the consent judgment-type settlement was entered. What Ms. Higgins is asking the panel to do is to award her damages under Chapter 93A-176D that are over 200 times the amount that she was entitled to by virtue of her tort settlements and the remaining policy limits combined. They tried to do that. We've appealed broadly across a whole range of issues in this case, from the Chapter 176D, Section 9 finding itself, et cetera, et cetera, et cetera. The main ways that Ms. Higgins tries to multiply the damages is by issues the Court's already talked about, and I'm going to try to address those first. One, whether the consent judgment is a valid judgment for purposes of multiplication under Chapter 93A, and two, the Section 11 claim. Let me start with the use of the consent judgment as a measure of actual damages. The raw standard issue that's been raised by Ms. Higgins, I think it's really a red herring. If you look at what... I'm sorry, but the way you phrased the question isn't quite right. It's not whether the consent judgment can be used as a measure of actual damages. The SJC has been very clear that if that type of judgment can be used, it is not an actual damages measure. That is the legislature's judgment that that... In that case, a jury verdict is what is used. So you better tell us why this consent judgment isn't like that judgment that the SJC announced this rule. I'll do that, Your Honor. Both parties have referred the Court to the Gore case as authority on the issue of when a consent judgment is usable as a judgment under Chapter 93A. And there's a number of factors that have to be involved. Obviously, the danger is that in this type of circumstance, there'll be a collusive settlement, a collusive agreement for judgment entered between the tortfeasor and the injured party. So under the Gore case, there's a number of standards that have to be met. In order to address the danger of collusion, the merits of the tort case have to be proved. The elements of the tort case have to be proved in the 93A case. The settlement amount has to be shown to be reasonable. And part of that reasonableness analysis, it's not only about the number involved in the settlement, but was there a collusive arrangement? Okay, so perhaps you could respond to the question which Justice Souter has raised. It's hard to call it collusive if you were given the opportunity to participate and you chose not to. Sure, I'll address that right now. So what happened was that in December of 2014, Ms. Higgins' lawyers drafted a letter, sent it to PJB's private counsel for private counsel to send to Capital, asking for permission to enter into these settlement negotiations and waive policy provisions such as cooperation clause and consent to settlement clauses. Capital responded to that letter in, I think, January of 2015, saying, we don't consent. We don't agree you can do that. We're defending you 100%. We've already offered our policy limits. We're doing everything that's required of us under the policy. And we don't consent to waive our policy defenses. And saying, we're going to go out and try to settle this case again. Those efforts went nowhere. And nothing happened then. There was no consent judgment entered. As far as Capital was concerned, the issue was dead. Then, in July of 2015, several months later, Capital was informed, I believe the day before the agreement for judgment was entered, that they, in fact, were going to go ahead with this arrangement. So, effectively, Capital had no notice whatsoever or no ability to get involved with the consent judgment. And then they went to court and filed it as a... So, Capital assumed when it said, no, we don't consent to your doing this, that they wouldn't do it. Correct. And Capital didn't keep tabs on whether they were doing it anyway. Well, there was no information provided to Capital as to whether that was happening or not. They went on with the defense of the case. Does the letter say, if you don't consent, we're going to go ahead anyway? The letter does not say that. It's in the record. That's my recollection of the letter, Your Honor. So, Ms. Lukey suggested that you did have an interest in being there and it was an interest in avoiding 176D liability and that that can be limited to situations where the insurer has willfully acted in bad faith and that as of the time of those settlement negotiations, she says, the Federal District Court found that you were acting willfully and in bad faith at that point. Well, we dispute the validity of those findings by the District Court. But in terms of the incentive to be involved, I guarantee you that Capital wasn't concerned at that time about 93A liability. It was concerned about defending its insured against these claims, which its defense counsel was telling it there were defenses available to it. Okay. As to that point, the District Court says essentially, well, there weren't any defenses because this was a clear violation of criminal law and the bar was clearly on notice. This wasn't a mistake. And so while normally under Massachusetts law, you can rely on reasonable judgments from counsel, defense counsel, here that was not reasonable reliance given the state liquor laws. Your Honor, I disagree that the violation of the state liquor laws, first of all, takes out of the liability. Yeah, but you didn't brief that question to us. Well, I believe that Ms. Hayden's brief admits that on the liquor liability claim, the statutory violation doesn't take the contributory negligence or the comparative negligence statute out of play as a defense. And we really have powerful facts here that Ms. Hayden, when she got in the car, was clearly aware of her condition. She knew she was potted. She sends a text. In some ways, it's really awful that she got into the car. But as Ms. Lukey points out, there was a second claim, which was the bouncer was supposed to not let her get into the car. I've never understood why they say that that makes any difference in terms of the comparative negligence statute. I mean, it's still negligent putting her in the car. Okay, rather than spend your time, I've asked for 28 J letters from both sides on this point within the next 10 days, please. Okay, go back to my question. I want to ask you a question about the failure to engage in a reasonable investigation. Is it your position that until the lawsuit was filed against the bar, it was only then that this obligation to conduct a reasonable investigation came into play? In other words, it's your position that until you have that unmistakable evidence of a claim in the form of a lawsuit, it was only then that your client had this duty to investigate? Exactly right, Your Honor. And the reason for that is that the statute that we're talking about, Violations of Chapter 176D, only comes into play and imposes obligations to investigate or to settle once a claim has been made. So you're saying that a claim is the same thing as a lawsuit? There's no difference between a lawsuit and a claim? I think a lawsuit is a subset of what could be a claim. But a claim, okay. A claim, but let's look at what... Let me just so you know what I'm concerned about. There is that letter from Attorney Donahue, I believe. Is that correct? Yes. Okay, and so within days of getting that letter, your client sends a very succinct letter saying, We have no liability at all. In other words, that letter would seem to understand that a claim is being made and we're saying that we have no liability with respect to that claim. That's well in advance of the lawsuit being filed. But you're saying that period of time does not count? I am saying that period of time doesn't count because that letter is not a claim. Because suppose we disagree with you and say the notice you were given was sufficient to tell you there was a potential claim out there. This was a serious accident. The DA's office launches an investigation of it. Actually, it's pretty clear that the young woman was quite intoxicated at the time of the accident, even before the lawsuit is brought because of that DA report. But you all just shut down the investigation by doing nothing other than talking with people who had a strong self-interest in denying that they had served her any liquor. Well, two responses, Your Honor. Well, two at least. First, if you look at the February 2013 letter, all it talks about are potential claims. It doesn't assert a claim. It doesn't include a demand for damages. It doesn't ask PJD to do anything really other than preserve its records and provide us information regarding your insurance. It doesn't say you owe me X dollars. It's not the type of claim that an insurance company could receive and respond to in a way that would deal with settlement discussions. I'm sorry. I never understood a quantum of damages was necessary to be provided to make something into a claim, and that surely would be bad law. Well, if you look at the only authority that's been provided, there's no authority in Massachusetts as to what constitutes a, quote, claim under Chapter 176D. But the only authority that's been provided to you was the Black's Law Dictionary definition of claim and some other cases from other states. Okay, but we can agree once you were aware of the lawsuit that then the issue of claim drops out, and even if whether or not there's an addendum, then you have an obligation to reasonably settle if there is liability, right? Correct, Your Honor. Okay, so can I go back to this point? By the time the lawsuit was filed, there was a lot on the public record that she was highly intoxicated, and that contributed to the accident. And the accident was not very far away from where the bar was, and so the notion that she tanked up while she was in the car on alcohol, you know, within a five or six or seven, eight-minute period, simply isn't plausible. So maybe you settled seven or eight months later, but there is a basis to think you should have settled the day that lawsuit came in. Well, Your Honor, I think if you look at the record, I mean, capital's got a duty to its insured also. It's insured as telling it repeatedly that nobody at the bar served her alcohol. And there certainly are other possibilities, and these possibilities are discussed at length in Attorney Stern's reports back to capital. She could have drank before she got to work. She didn't start work until 10 p.m. that night. She could have drank after work. There was a half-an-hour time period or so that that could have happened. She could have been served drinks or given drinks by patrons without being served by PJD. So there were versions of the facts in dispute under which PJD's liability certainly would be less. Counsel, it's clear from Attorney Stern's investigation that if your client had done the investigation that the district court judge here says should have been done immediately, your client would have understood that those self-serving assertions of the employees at the bar were not a reasonable basis for concluding that there was nothing for the insured or the insurance company to worry about. As soon as Attorney Stern's got involved, he realized immediately there were problems here. He found out very quickly that she was almost surely drinking on the job, that other employees saw her. But in that initial investigation of your client, they contended themselves with just talking to a few employees who had an interest in denying that she was served any drinks. That view clearly informs the district court's conclusion that this was not a reasonable investigation by your client. Well, Your Honor, I think the court does overwhelmingly look at the pre-claim time period and criticize capital's conduct immediately in January of 2011 when the investigation was terminated. And it's that. And when Attorney Donohue sends that letter, your client relies entirely upon that which you characterize as pre-claim investigation. It does nothing else of an investigative nature until the lawsuit is filed. Isn't that correct? Well, the only other thing that happens in the meantime is Capital receives a letter from PJD, an affidavit from one of the other workers at the bar, indicating that that worker had been approached by representatives of Ms. Higgins and offered a bribe in exchange for testimony about her. So Capital receives that and they have that, which tends, of course, to support the notion that there was some credibility to what the folks at PJD were telling Capital about the situation. And also, Your Honor, I think at the end of the day, it really doesn't matter what Capital's investigation was at that time because even if they had done the full investigation, liability wouldn't have been shown to be reasonably clear. That's supported in spades by Mr. Stern's testimony. He's presenting this as a he-said-she-said situation. The bar folks are saying one thing. She is saying another, in her complaint at least. And actually at her deposition, it doesn't matter much. But these are separate issues. The reasonable investigation, that's one issue, and that's an independent basis for liability. And then there's an entirely separate question, whether there was a reasonably prompt settlement and lined up an awareness of liability and damages. Those are two very distinct issues. They overlap, Your Honor. Under the Van Dyck case, if a proper investigation wouldn't have shown liability was reasonably clear, then there's no liability for the investigation failures. That's right. And here, Your Honor, I think it's really important to keep in mind that the DA investigation that was performed, that investigation didn't turn up any evidence that she actually had been served by PJD at the bar. No, but it was quite clear she was heavily intoxicated at the time of the accident. Correct. And Attorney Sterns advised Capitol repeatedly when Capitol, all through the summer and fall of 2013, should we make a policy limits offer? This is a wasting policy. Should we make a policy limits offer? The response they got every time was, I need to take her deposition and assess her credibility before I can make a settlement recommendation. The reason it took until December for that settlement recommendation to be made is because Ms. Higgins didn't respond to written discovery that was pending and out there and they were waiting for it before they took that deposition. Okay. You've argued that in your brief. Is there anything more you need to tell us? Just one. We sort of got off onto a different track. I was originally talking about the Gore case. I think it's important for the court to be aware. I mean, this is in the briefs also, that Gore relies on underlying cases about when, non-93A cases, about when a settlement is, a consent judgment is enforceable against an insurer. Since the case was tried, there's been a further development in that body of law, the Safarowicz case. And the Safarowicz case says in order for the judgment to be enforceable against the insurer, there has to be a hearing on reasonableness conducted by the court issuing the judgment. But that's not a case that involves findings of willfulness and bad faith, correct? It's not, Your Honor. But Gore is, and Gore looks to that underlying body of law. Safarowicz changes that underlying body of law. So the suggestion I'm making to you is that you need to apply Safarowicz to whether that judgment is enforceable as a measure of damages under Chapter 95. You've argued that in your brief, and the other side has also replied to it. So I think we've heard enough on that. Thank you. Thank you all very much. Quickly, with regard to issues of timing on when the insurer act, the trial court found on page 11 that while the accord notice was not itself a claim, that the cover email forwarded to the insurer by the broker, which set forth information about the underage drinking and so forth and the fact that she was served, was this information alone was more than sufficient to put capital on notice that this was not an ordinary claim. So I'm saying it's more than just a claim based on the information that they conveyed, not with a computerized notice, but in the cover email. Next, the question of the tendering of the policy, the court doesn't deal with it because the record showed and was undisputed that it was not received. It was sent to the wrong email address. Presumably, Mr. Stern would have gotten a bounce back, but in any event, it wasn't received. And immediately thereafter, or shortly thereafter, came Mr. Donohue's letter of representation regarding the claims. And in reply to that, this is very important, Exhibit 11 in this case is Capital's letter rejecting the claim and effectively denying liability, offering nothing. And in there, interestingly, in their own letter, they say, our claim number, with regard to Ms. Higgins, and state the number of their claim. And then on page 13, the judge goes back and talks about the fact that you can't stick your head in the sand, that the Northfield investigation, if they hadn't shut it down, would have revealed the clear liability and the fact that a more thorough investigation would reveal the truth of the facts. What is the date of Exhibit 11? February 13, 2012. That's in response to the attorney representation letter in which he said, we represent her, we have these issues that we're going to present. And then finally on that issue, their own claims manager, Mr. Wedgwick, testified, this is actually on another issue, on the comparative negligence issue, that their theory had been that maybe she had brought alcohol to work in a bottle and it didn't pan out, everyone said it wasn't true. He said, at that point in time, our comparative negligence theory went poof. So they were trying to show that she had brought her own alcohol. They admit they couldn't, and that was the end of it. Counsel, on the prop settlement issue, I gather it's your position that the reasonable investigation and prop settlement issues, they're connected in the sense that if they had done a reasonable investigation from the time, as you say, a claim was filed, they would have understood, as soon as that lawsuit was filed, that the liability was clear, they would have a sense of the damages, and so they should then have engaged in prop settlement. There wasn't a need to go on for another seven or eight months to do the investigation that Attorney Stearns did. That should have already been done, basically. What you said is true, but our position is that, and the judge says this, if they had allowed Northfield to do its investigation, they would have known in 2010, the accident was November 27, 2010, they brought Northfield in, left them in place for like six or, I think it was a few days, and then said stop working, when all they had done was do phone interviews with the bartender, the owner, and his brother, the club manager, and nothing else. Northfield had said what they needed to do, and Capital said stop, and they never did another investigation before the filing of the lawsuit, even when Attorney Donohue's letter was received, and notwithstanding that the cover email to the court already told them this had been service of a minor, which they believed... But you're not arguing they had to settle before the lawsuit was filed. Well, Your Honor, by statute, they must do a reasonable investigation promptly, that's way before the suit is filed. No, no. So, I believe your answer to Judge Lopez's question is, yes, there's a direct linkage. If they had done a reasonable investigation, they would have settled. Yes. They would have settled immediately. My question goes to, did they have, on your view of the law, did they have to settle before a lawsuit is even filed? If their liability became reasonably clear, that is, if it became clear that there was liability of their insured as a result of their investigation before the lawsuit was filed, the answer to that question is yes. But if they didn't do the investigation to get them there, then I assume your answer is it would take a lawsuit. Well, it would, but that does not excuse them. Their unfair insurance practice would still have occurred. Yeah, okay. So, our point is the unfair insurance practices had occurred long before the lawsuit was filed, and they then delayed even further. Attorney Stern became involved and within six days was able to tell them most of the facts that they needed to know. And I do refer the Court to page 13 of the District Court decision where the judge opines on what would have happened had they allowed the investigation of Northfield to go forward in terms of when the settlement would have occurred. Thank you, Ms. Berkey. Thank you very much. Thank you both. The Court is going to take a recess before the next case. All rise.